THE UNITED STATES, APPELLANTS, *v.* JOHN W. LOW ET AL., APPELLEES.

A Florida land claim. On the 6th of April, 1816, a grant was made by the Governor of Florida of five miles square, or sixteen thousand acres of land, on condition that a mill should be built.

The grant of six thousand acres was for land on Doctor's Branch, where the mill was intended to be erected. The ten thousand acres were granted on the north-east side, on the lagoon of Indian river. The six thousand acres were surveyed in 1809, on Doctor's Branch, and the mill was built. The survey under this grant, was confirmed.

The survey of ten thousand acres was made in February, 1820, by the surveyor-general of Florida, "north-westwardly of the head of Indian river, and west of the prairies of the stream called North Creek, which empties itself at the head or pond of said river."

official return of the surveyor-general has acceded to it the force of a deposition. land granted could only be surveyed at the place granted; if elsewhere, it would nave been a new appropriation, and therefore void, and contrary to the eighth article of the treaty with Spain.

According to the strict ideas of conforming a survey to a location, in the United States, the survey of ten thousand acres should be located adjoining the natural object called for, there being no other to aid and control the general call; and therefore the head of the lagoon would necessarily have formed one boundary. But it is obvious, more latitude was allowed in the province of Florida, under the government of Spain.

The surveyor-general having returned that the survey was made according to the grant, and in the absence of other contradictory proof, the claim was confirmed.

ON appeal from the Superior Court of East Florida.

The heirs of John Low claimed sixteen thousand acres of land in East Florida, under a grant by Governor Coppinger, founded on a petition alleged to have been presented by their ancestor, dated 20th March, 1816, and a decree of Governor Coppinger thereon, dated April 6th, 1816. The petition states, that, "bounding with the petitioner's land, on Bell river, there was a creek known by the name of Doctor's Branch, which was suitable for the establishment of a water saw-mill, and, as he could construct, and was desirous of constructing immediately, a saw-mill on said place, if he could obtain the permission of government, and a grant of the accustomed quantity of land for the supply of lumber, and the assurance, in his favour, that the great expenses that were indispensable to its construction, and the risks to which he

would be liable, would be compensated; he therefore prayed that the governor would grant him five miles square of land, or its equivalent, permitting him to take six thousand acres in the vacant lands in the neighbourhood of Doctor's Branch, and ten thousand acres on the north-west side of the head or lagoon of Indian river."

The governor's decree on this petition states, that, "in consideration of the benefit and utility that would result to the province, should it be executed as the petitioner proposed, he grants him the permission he asked, likewise the lands at the places he mentioned; with the express condition, that, until he erected the said machine, he should not have an absolute right in them," &c.

The originals of the petition and decree were not produced in evidence, neither are they to be found in the archives at St. Augustine. A certified copy, dated April 6th, 1816, under the hand of Thomas de Aguilar, secretary of the government, (whose handwriting was proved,) stated to be faithfully drawn from the original in his office, was alone offered; and was objected to on the part of the appellants.

There were also produced two plats and certificates of survey, made by George J. F. Clark, the surveyor-general, for John Low. The first is dated December, 23d, 1819, for "six thousand acres of land in the place called Doctor's Branch, on Bell river." The second is dated February 7th, 1820, for "ten thousand acres of land north-westwardly of the head of Indian river, and west of the prairies of the stream called North Creek, which empties itself at the head or pond of said river."

Among the witnesses examined to prove the building of the mill, was George J. F. Clark; who was objected to by the district attorney. The objection to the testimony of George J. F. Clark, taken in the Superior Court, was made on the ground that he was interested in the case. It appeared from the record, that after he had been examined on interrogatories to prove the surveys made by him, the following was attached, at his request, to the examination of the commissioner.

"I further state, that in February, 1821, I purchased of the said John Low a tract of land embraced by this grant; this I mention in support of my confidence in the integrity thereof;

SUPREME COURT.

while I exercise the candour due to the honourable Court in this case, and to myself as a witness. Perhaps it may be necessary to add, that before February, 1821, I was entirely uninterested in this grant.

GEORGE J. F. CLARKE.

Before me, K. B. GIBBS, Commissioner."

After hearing the testimony, the Court made a decree in favour of the claimants for both tracts of land, from which the present appeal is taken.

The case was argued by Mr. Legare, the attorney-general, for the United States; and by Mr. Berrien, and Mr. Wilde, for the appellees.

For the United States it was contended:

1. That the testimony of Clarke was improperly admitted.

2. That there was not sufficient evidence that the said alleged grant or concession was ever made by Governor Coppinger.

3. That the alleged concession, if ever made, was on a condition precedent, which was never fulfilled.

4. That the description of the six thousand acres in the neighbourhood of Doctor's Branch, is too vague to be the foundation of a valid survey.

5. That the plat and certificate of survey for the tract of ten thousand acres, do not answer to the description contained in the pretended grant, and so cannot be the origin of title.

The attorney-general said, that, as the representative of the United States, it was his duty, in all the cases of land claims sent up from Florida, to examine them with a judicial eye.

The act of Congress requires that all the cases of this description brought before the Courts of Florida, in which the decision shall be against the United States, should be brought by appeal to this Court. If the law officer of the government see any thing in the case, it is his duty to present it to the Court for its decision; and, in doing this, he is not restrained by any thing which may have been done or omitted by the district attorney of the United States, before the Courts of Florida. The whole subject is open; and under this view the whole of the matters before the Court below

may be fully examined, and exceptions taken here, which had been omitted upon the first hearing of the case.

That this grant is null and void, has been already decided on the principles settled by this Court in the case of the United States *v*. Sibbald, 10 Peters, 313; and in other cases. This was a grant on a precedent condition, the establishment of a mill. The con-ın was not performed. The evidence is insufficient to establish the improvement. The description of the land in the grant is too vague and indefinite.

The evidence of Clark should have been rejected by the Court; and this Court will exercise the power to strike ıt out, although it was allowed to be read by the district attorney of the United States. The memorandum made by the commissioner, ı ter taking the examination, shows his interest in the case. He had purchased a part ot the very grant his testimony was to sustain.

As to the regulations of Spain relative to grants of lands by the governors of their territories, and which this Court had declared to be in force, the attorney-general cited 2 White's New Recopilacion, 278.

Mr. Berrien and Mr. Wilde, for the appellees.

No question can be presented to the Court, on this record, which has not already been decided in the many Florida cases which have been frequently examined and decided by it. The grants are sufficiently descriptive. The lands were found by the surveyor-general, under the Spanish government; and surveys and plats were made of them. Whether the survey ot the ten thousand acres was near to or distant from the six thousand acre tract, is of no consequence. The power of the Spanish governor to make the grant where he thought proper, was complete.

The construction of Spanish grants is not determined by the principles of the common law, but by the laws and ordinances of Spain, by treaties, and by the orders of the king. This has often been so held by this Court. Cited, Delespine's Case, 15 Peters, 341.

The evidence to establish the performance of the condition, is sufficient without the testimony of Clarke. But still Clarke's evidence is insisted upon. A party is not to be taken by surprise by a new exception in this Court, and to be called upon to sup-

port the legality of evidence which was allowed by the Court below. Cases from Florida are not exceptions to the principles which govern other appeals brought here.

But the testimony of Clarke was legal. The statement made by the commissioner is no part of his evidence; and if it is, it does not show that he was interested at the time of his examination. He had been interested, but that interest might have ceased. He does not assert a present interest.

Mr. Justice CATRON delivered the opinion of the Court.

This was a mill grant of five miles square of land, or sixteen thousand acres: that is, at Doctor's Branch, where the mill was intended to be erected, six thousand acres; and ten thousand acres "on the north-west side of the head or lagoon of Indian river."

The concession was made (6th of April, 1816,) on the condition that the mill was built. The mill was erected.

The first survey was made at Doctor's Branch, in 1819, and is free from objection.

The second, for ten thousand acres, was made February, 1820, by the surveyor-general of East Florida, "north-westwardly of the head of Indian river, and west of the prairies of the stream called North Creek; which empties itself at the head or pond of said river." Such is the description in the certificate of the surveyor-general. The survey had been objected to, but the objection was withdrawn at the hearing below; and it is insisted that a waiver of its legality must be inferred. The objection extended to the competency of the paper as evidence, and not to its effect when heard; so the Court held in Breward's Case, at this term.

The official return to the surveyor-general has accorded to it the force of a deposition. So we held in the cases of Breward and Hanson; to which we refer.

The land could only be surveyed at the place granted; if elsewhere, it would have been a new appropriation, when the survey bears date in 1819, contrary to the eighth article of the treaty with Spain: and the question is, was it at the proper place.

It was granted "on the north-west side of the head of Indian river, or lagoon."

According to the strict ideas of conforming a survey to a location, in the United States, the survey would be located adjoining the natural object called for, there being no other to aid and control the general call; and therefore the head of the lagoon would necessarily have formed one boundary.   But it is obvious more latitude was allowed in the province of Florida.   The object of the grant was timbered land, fit for the supply of lumber; and if the nearest vacant timbered land to the head of the lagoon was surveyed, the intentions of the government and of the grantee were complied with.   This was the construction given by the surveyor-general to the words "north-west side."   He permitted the general call to vary so far, and no farther, as to secure timbered land, excluding the prairies next the head of the lagoon. The legality of the survey depends on the fact.   The description given in the certificate above recited, and that set forth by the decree must be taken together; the lines and boundaries on other lands are given in the decree.   The complaint is, that the land was surveyed too far west.   On the north, it is bounded by the lands of Charles Sibbald; on the south, by those of John M'Intosh; on the west, by royal, or vacant lands; and on the east, by the prairies of North Creek, which empties itself at the head of Indian lagoon.   There is no evidence that North Creek is navigable.   If there was such evidence, as the survey includes the creek, we would reverse the decree, and order the survey only to front one-third part on the creek.   The surveyor-general certifies that this ten thousand acres is the tract of land granted to the petitioner, on the 6th of April, 1816: and, although no reliance would be placed on the assertion in the certificate, standing alone; still, taking the return that the survey was on the land granted, in connection with all the facts and circumstances appearing in the record, and it tends to confirm the conclusion that the land was laid off on the next land to the head of the lagoon, covered with timber.   One other consideration has weight.   If it be untrue that the survey is at the proper place, the United States could have proved the fact to a certainty, with the slightest diligence; and ought to have proved it.   This consideration is strengthened by the pleadings and evidence.   The petition filed in 1829, alleges that the surveys were made for lands granted; and sets out the descriptions, courses, and distances, to which the

attorney of the United States made no answer: the fact was not admitted for this reason, and necessary to be proved by the complainant, 6 Cranch, 51; yet it shows that the claim was not resisted on this ground; and such was clearly the case throughout, as George F. Clarke, the surveyor-general, was twice examined as a witness, on many interrogatories, without having been requested to state the locality of the ten thousand acres survey. Upon all these facts and circumstances taken together, we order the decree to be affirmed.